**Roy D. BAKER and Jane F. Baker, Plaintiffs,**

v.

**WHEAT FIRST SECURITIES and John K. Merical, Defendants.**

Civ. A. No. 3:85–1281.

United States District Court,
S.D. West Virginia,
Huntington Division.

Sept. 8, 1986.

William L. Mundy, Baker & Mundy, Huntington, W.Va., for plaintiffs.

John K. Merical, Poca, W.Va., pro se.

Larry A. Winter and Cynthia A. Nelson Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., for Wheat First.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending before the Court are the cross motions for summary judgment made by the Defendant, Wheat First Securities (Wheat), and the Plaintiffs. Both motions have been well briefed and the Court now deems the same mature for decision.

### I. *Brief Background*

This action arises out of the alleged defalcations of John K. Merical. Merical was employed as a stock broker by Defendant Wheat. During his employment, Don and Jane Baker, husband and wife, decided to open an account with Wheat. Having been solicited by Merical, their account was as-signed to him. He was their account executive.

The Plaintiffs allege that Merical engaged in a variety of wrongdoing while serving as their account executive and that they were damaged as a result. They contend, *inter alia,* that he made unauthorized trades in their account, bought stock that was unsuited for their investment objectives, misappropriated money from their account and from them personally, made fraudulent representations to them and breached his fiduciary duty to them.

The summary judgment motions address a variety of issues. The Court writes as much to clarify its perspective on the law as to dispose of certain claims. Each issue will be addressed in turn.

### II. *Discussion of Wheat's Motion for Summary Judgment*

#### A. *Statute of Limitations.*

##### 1. Federal Securities Law Claims.

Wheat argues that the Bakers' federal securities claims and common law claims are barred by the applicable statute of limitations. That limitations period, according to Wheat, is two years. It borrows that period from *W. Va. Code,* § 55–2–12. The Court finds Wheat's argument to be well taken as to the common law fraud claim; a two-year limitations period does apply. As to the federal securities claims, however, the Court believes the West Virginia Blue Sky Act, *W. Va. Code,* § 32–1–101, *et seq.,* to provide the better analogy. Therefore, the Court adopts its three-year limitations period.

The Plaintiffs and Wheat both agree that with the lack of a limitations period for implied actions under Section 10 and *Rule* 10b–5, a federal court must "borrow" the limitations period from the forum state's most analogous cause of action. *Ernst and Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *O'Hara v. Kovens,* 625 F.2d 15 (4th Cir. 1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981). Wheat contends that because the Plaintiffs' action is based upon fraud, the limitations period for

a common law fraud action should be borrowed. The Court disagrees. Although there may be a split of authority, several other courts have utilized the limitations period of a particular state's Blue Sky law and the Court deems such to be the preferrable course to follow. *See e.g., O'Hara v. Kovens, supra,* and *Fox v. Kane-Miller Corp.,* 542 F.2d 915 (4th Cir.1976) (adopting limitations period of Maryland securities act for *Rule* 10b–5 action); *Newman v. Prior,* 518 F.2d 97 (4th Cir.1975) (Virginia Blue Sky law was analogous statute for borrowing limitations period). Moreover, Wheat admits in its memorandum in opposition to the Plaintiffs' pending motion for summary judgment that the lead section of the West Virginia Blue Sky Act, *W. Va. Code,* § 32–1–101, "parallels" Section 10(b) of the federal act. Wheat's memorandum at 19. *See also State v. Fairchild,* 298 S.E.2d 110, 129 (W.Va.1982) ("Section 101 of the Uniform Securities Act is substantially *Rule* 10b–5 promulgated by the federal Securities and Exchange Commission").[1] Accordingly, the Court holds that a three-year limitations period governs the Plaintiffs' federal securities law claims.

In making its statute of limitations argument, Wheat divided the Plaintiffs' claims into three categories: (1) federal securities law fraud, (2) state securities law fraud, and (3) common law claims. As to the state securities fraud category, Wheat recognizes that a three-year statute of limitation applies; therefore, it does not assert the bar of the statute of limitations as to that category of the Plaintiffs' claims. A

*fortiori,* since a three-year limitations period has also been found appropriate for the federal securities law fraud claim, the Court assumes that Wheat would accept the federal claims as being timely.[2]

2. Common Law Theories

Both Wheat and the Plaintiffs agree that a two-year limitations period applies to the Plaintiffs' common law theories. *W. Va. Code,* § 55–2–12; *Stanley v. Sewell Coal Co.,* 285 S.E.2d 679 (W.Va.1981). They also agree that the proper inquiry is when the statute began to run. They disagree, however, as to when that occurred. In any event, since the Plaintiffs' action was initiated on April 23, 1985, the operative date is April 23, 1983. If the statute began to run prior to that date, the action, insofar as it relates to acts completed prior to that date, is time barred.

Wheat argues that the Plaintiffs either had actual knowledge or should have been put on notice to make an inquiry prior to April 23, 1983. It makes this assertion in regard to three different aspects of the Plaintiffs' case. As to the unauthorized trading in the Plaintiffs' accounts, Wheat points out that the Plaintiffs received a confirmation slip each time a purchase or sale occurred within their account. The slip would specify what securities the Plaintiffs had purchased. Moreover, Wheat also sent the Plaintiffs a security account statement on a monthly or periodic basis. Such statement described every transaction which occurred in the Plaintiffs' account for the period covered. In

---

**1.** Although the Court finds that § 32–1–101 does not itself give to rise civil liability, a variation of that section, § 32–4–410, does so expressly. Section 410 does not provide for a civil action identical to that usually brought under *Rule* 10b–5, but the Court believes it is sufficiently analogous to lend its statute of limitations to a *Rule* 10b–5 action. This conclusion is buttressed by the West Virginia Legislature's express desire "to coordinate the interpretation and administration of [the state act] with the related federal regulation." *W.Va.Code,* § 32–4–418.

The Court further notes that the Fourth Circuit in *O'Hara v. Kovens, supra,* borrowed the statute of limitations period in the Maryland Blue Sky Law for a *Rule* 10b–5 action even

though at the time the cause of action accrued the state statute did not provide a civil remedy. The court found the fact that the state statute proscribed the specific behavior challenged in the civil suit warranted the conclusion that the state statute was analagous.

**2.** A key portion of Wheat's argument on the suitability of a two-year limitations period is its contention that the discovery rule, an equitable tolling provision, does not apply because the Plaintiffs had actual or constructive knowledge of any fraud more than two years before bringing the action. Wheat, however, does not make this argument when confronted with a three-year limitations period.

addition, the Plaintiffs also received annual summaries which described each transaction which took place during the preceding year. Wheat argues that these documents either provided the Plaintiffs with actual knowledge of unauthorized trading or should have spurred them to make an inquiry. Indeed, Wheat submits that the Plaintiffs did inquire of Merical and then unreasonably accepted his stock answer that everything was fine.

The Plaintiffs complain that $1,000 given to Merical on November 25, 1982, for purchase of shares in American Pace Fund was appropriated by Merical for his personal use. Wheat contends that the Plaintiffs should have been put on notice of this "fraud" prior to April 23, 1983. Plaintiffs, according to Wheat, never received anything in the mail pertaining to the purchase. Specifically, the Plaintiffs received periodic account statements dated December 31, 1982, January 31, 1983, February 28, 1983, and March 31, 1983. None of those statements made any reference to the purchase of American Pace Fund stock. It also appears that Mr. Baker called Merical and questioned him about American Pace Fund not showing up on the account statements.

On March 13, 1983, Merical allegedly used a letter of authorization to transfer $15,250 from the Baker's joint account to the account of another Wheat customer. Wheat argues that the Plaintiffs also had actual notice of this fraud prior to April 23, 1983. It contends that the transfer of funds was reflected as a debit on the Plaintiffs' March 31, 1983, securities account statement. This statement, according to Wheat, should have reached the Plaintiffs in the early part of April, 1983. The debit appeared on page 1 of the statement. Moreover, Wheat submits that the Plaintiffs, by comparing the February 28, 1983, statement with the March 31, 1983, statement, should have discovered that the value of their account had decreased from $45,162.24 to $36,979.41.

In response to the above "facts" gathered by Wheat, the Plaintiffs counter that Mr. Baker did not understand what he was reading—that he was an unsophisticated investor who relied completely on his friend, John Merical. Mr. Baker would contact Merical to get clarifications and would receive explanations which appeared to him to be plausible. For instance, Merical allegedly would sometimes represent that all holdings of the Plaintiffs were not reflected on the statement, or that there were mistakes on the statements. In addition, the Plaintiffs cite the testimony of Ed Knowles, Branch Manager of Wheat's branch office in Charleston, West Virginia, to the effect that the difficulties encountered by Mr. Baker in understanding the statements were not uncommon to Wheat's customers.

As mentioned, both of the parties appeared to be in agreement that the West Virginia court would apply a discovery rule for fraud actions. *See Brock & Davis Co. v. Charleston National Bank*, 443 F.Supp. 1175 (S.D.W.Va.1977) (in dicta the court predicted that West Virginia would apply a discovery rule to actions in fraud). The rule would presumably be similar to the federal equity doctrine: "[T]he discovery of fraud is either the date of actual discovery or the date on which the plaintiff in the exercise of reasonable diligence should have made such discovery." *John Hopkins University v. Hutton*, 488 F.2d 912, 917 (4th Cir.1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974). In this vein, the Eighth Circuit has held that the standard is an objective one. *Koke v. Stiffel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1343 (8th Cir.1980). The Plaintiffs must act as reasonably prudent persons.

Wheat relies on the *Koke* case to illustrate that the Plaintiffs here did not act reasonably in discovering (or not discovering) the fraud being perpetrated upon them. In *Koke*, the plaintiff testified that the confirmation slips and account statements she received were written in "hieroglyphics." She ignored the documents and placed complete trust in her broker as he traded away the greater part of her sav-

ings. The court found that the confirmation slips and monthly account statements "were sufficient to require the initiation of an inquiry." *Id.* at 1343. More generally, the court held that "[i]nvestors are not free to ignore warning signals which would cause a reasonable person to ask questions, but must 'exercise reasonable care and diligence in seeking to learn the facts which would disclose fraud.'" *Id.* (quoting *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974)).

The Court agrees with the principles of law found in *Koke*. In light of the documents sent to the Plaintiffs by Wheat, a doubt exists as to whether the Plaintiffs timely initiated their common law claims. Nevertheless, the Court believes that the Plaintiffs have raised an issue which would make summary judgment inappropriate. The Plaintiffs argue that many Wheat customers had difficulty understanding the statements sent out by Wheat. The Court believes that such a state of facts, if proven, may influence the determination of the reasonableness of the Plaintiffs' inaction. While the Plaintiffs may still not be able to create an issue for the jury as to this point, the Court favors an "inquiry" into the facts ... to clarify the application of the law. *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950).

The Court also takes the same approach in addressing Wheat's argument regarding the Plaintiffs' inquiries of Merical. The Court does not necessarily disagree with Wheat's position that the Plaintiffs had a duty to inquire of someone other than Merical to ascertain the nature of their claims. *See Malitsky v. Merrill-Lynch, Pierce, Fenner & Smith*, 540 F.Supp. 783 (N.D. Ohio 1980). Nevertheless, Judge Christie recognized in *Culbertson v. JNO McCall Coal Co.*, 275 F.Supp. 662 (S.D.W.Va.1967), that a confidential relationship, such as the one arguably shared by Merical and the Plaintiffs, may negate the need of a plaintiff to make inquiry of fraud. Moreover, there also exists the question of whether Merical affirmatively acted to conceal his fraud. *Brock & Davis Co. v. Charleston*

*National Bank*, 443 F.Supp. 1175 (S.D.W. Va.1977).

The Plaintiffs cite *Handley v. Town of Shinnston*, 169 W.Va. 617, 289 S.E.2d 201 (1982), for the proposition that where "a tort involves a continuing or repeated injury, the cause of action accrues at, and the limitations begin to run from, the date of the last injury, or when the tortious overt acts cease." *Id.* 289 S.E.2d at 202. The Court does not agree that *Handley* controls here. The rule relied upon in *Handley* is directly traceable to the type of injury involved. A city water line developed a leak and over several years disgourged water upon the plaintiff's property. The water slowly caused damage to the plaintiff's property. Although perhaps capable of some division, the injury was in actuality of a singular nature. There was only one object which was subjected to injury. An ongoing injury to one property interest is distinguishable from a series of wrongs, albeit related, to a variety of interests, each susceptible of independent marshalling of facts and calculation of damages.

**B.** *Respondeat Superior*

Wheat seeks a ruling that it is not liable to the Plaintiffs on the common law theory of *respondeat superior*—that it cannot be held vicariously liable for the defalcations of Merical. In support of this position, Wheat relies upon the controlling person provision found in Section 20(a) of the 1934 act.

> "Every person who, directly or indirectly, controls any person liable under any provision of this title [15 U.S.C. §§ 78a, *et seq.*] or of any rule or regulation thereunder shall also be liable jointly and several with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

15 U.S.C. § 78[a]. Wheat contends that any liability which it may be exposed to must be considered under the standard of

this controlling person provision. Simply put, its position is that the provision supplants common law agency principles.

█ Whether a broker-dealer's liability is exclusively governed by the controlling person provision is a question over which the circuits have split. For a collection of cases see *Haynes v. Anderson & Strudwick, Inc.*, 508 F.Supp. 1303, 1308–09 (E.D. Va.1981); Loss, *Fundamentals of Securities Regulation*, 1181 n. 21 and (Supp. 1985). The *Haynes* court characterized the Fourth Circuit's position as "ambiguous." This Court is not inclined to agree. In *Johns Hopkins University v. Hutton*, 422 F.2d 1124 (4th Cir.1970), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974), the Fourth Circuit held that the defendant broker-dealer was "liable under familiar principles for the tortious representations of its agent." *Id.* at 1130. It agreed with the trial court judge, Judge Kaufman, "that Section 15 of the Act [15 U.S.C. § 77o] was not intended to insulate a brokerage house from the misdeeds of its employees." *Id.* (brackets in original).[3] *See also Carras v. Burns*, 516 F.2d 251 (4th Cir.1975) (broker-dealer's liability may arise under principles of vicarious liability).

Wheat argues that *Johns Hopkins* and *Carras* have been superseded by the Fourth Circuit's decision in *Carpenter v. Harris, Upham & Co., Inc.*, 594 F.2d 388 (4th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). *Carpenter* involved a suit against a broker-dealer under the controlling persons provisions of the 1933 and 1934 acts. The court discussed those provisions in the following terms:

"When originally passed by Congress, § 15 of the 1933 Act held controlling persons absolutely liable for § 11 and 12 violations by controlled persons. Congress, in passing the 1934 Act, amended § 15 of the earlier Act, adding the language beginning at 'unless the controlling person had no knowledge of or rea-

sonable ground to believe in the existence of facts by reason of which the liability of the controlled person is alleged to exist.' Likewise, the controlling person provision in the new Act, § 20(a), contained the 'good faith' defense to liability. Clearly Congress had rejected an insuror's liability standard for controlling persons in favor of a fiduciary standard—a duty to take due care.... The intent of Congress reflected a desire to impose liability only on those who fall within its definition of control and who are in some meaningful sense culpable participants in the acts perpetrated by the controlled person ... the Supreme Court has noted that in each instance where Congress has created express civil liability in favor of purchasers or sellers of securities, it is clearly specified whether recovery was to be premised on knowing or intentional conduct, negligence, or entirely innocent mistake.... The controlling persons provisions contain a state-of-mind condition that requires a showing of something more than negligence to establish liability."

*Id.* at 394. The district court in *Haynes v. Anderson and Strudwick, Inc., supra,* found the *Carpenter* holding to be "irreconcilable" with the earlier holdings in *John Hopkins* and *Carras*. Although expressing "unease" in doing so, the *Haynes* court held that the earlier cases had been overruled *sub silentio*.

The district court in *Haynes* was concerned with the contradictory results which might develop if a plaintiff could, by resorting to common law principles, thwart the defenses made available to a controlling person. Its reasoning was based on its interpretation of the *Carpenter* decision as extending the defenses of the controlling person provision to a broker-dealer. The Court does not agree with the *Haynes* court as to the effect of the *Carpenter* decision. Rather, the Court notes with ap-

---

3. The Court was dealing with the controlling provision found in the 1933 act, rather than the one in the 1934 act. The wording of the two is slightly different, but as the *Haynes* court noted, "[t]he availability of ... liability is the same under either ... despite the variations in language in the two provisions." 508 F.Supp. at 1310, n. 5.

proval the distinguishing features of *Carpenter* as illuminated by the district court in *Frankel v. Wyllie & Thornhill, Inc.,* 537 F.Supp. 730 (W.D.Va.1982).

The *Frankel* court pointed out that *Carpenter* "dealt with an action actually brought under the 'controlling person' provisions and not under an agency theory." *Id.* at 741. It observed that the *Carpenter* court did not address at all the issue of common law principles being preempted, "undoubtedly because the issue was not presented by the case." *Id.* Moreover, the court surmised that the plaintiffs were put in the awkward position of relying solely upon the controlling person provisions because the broker whose activities supposedly gave rise to liability was not an employee of the defendant at the time the sale of the securities occurred. Recognizing that there was a split in the circuits, the *Frankel* court nevertheless felt bound to apply the rule announced in *Carras* and *Johns Hopkins.*

The Court follows the lead of the *Frankel* court in distinguishing *Carpenter.* The Court believes that the Fourth Circuit yet follows the majority rule which recognizes common law liability. As an added note, the Court would point out that this majority view is incorporated into the proposed Federal Securities Code. *Code,* § 1724(a).

With the above considerations in mind, the Court will deny this portion of Wheat's summary judgment motion. Common law principles of agency will continue to be relevant.

### C. *Punitive Damages*

Wheat has moved for summary judgment on the issue of punitive damages. Its position is that punitive damages are not recoverable from it in this action. The cornerstone of Wheat's argument is its assertion that the controlling person provision exclusively governs the question of liability as to Wheat. And since punitive damages are unavailable under the federal securities laws, Wheat concludes that the Plaintiffs are precluded from recovering punitive damages from it.

Wheat's syllogism is flawed insomuch as the Court has determined that the controlling person provision does not preclude the Plaintiffs from proceeding on common law theories of liability. The Court does, however, accept Wheat's argument that punitive damages are not recoverable under the federal securities laws, such as an action under *Rule* 10b–5. *Hatrock v. Edward D. Jones & Co.,* 750 F.2d 767 (9th Cir.1984); *Carras v. Burns,* 516 F.2d 251 (4th Cir.1975). Rather, relief is limited to compensatory damages. *Johns Hopkins University v. Hutton,* 326 F.Supp. 250 (D.Md.1971), *affirmed in part, reversed in part on other grounds,* 488 F.2d 912 (4th Cir.1973), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed. 24, 118 (1974).

On the other hand, punitive damages may be awarded against a principal, such as Wheat, on common law theories. *Coffee v. Permian Corp.,* 474 F.2d 1040, 1044 (5th Cir.), *cert. denied,* 412 U.S. 920, 93 S.Ct. 41, 38 L.Ed.2d 129 (1973) (exemplary damages may be awarded if allowable under state law when a state law violation is joined with a 10b–5 complaint); *see also Miley v. Oppenheimer & Co.,* 637 F.2d 318 (5th Cir.1981). The law of West Virginia recognizes that circumstances may develop whereby an award of punitive damages against a principal for the acts of an agent may be appropriate. The standard is not one of vicarious liability. In other words, punitive damages may not be imputed to the principal merely because of the agency relationship. In a relatively recent case, *Addair v. Huffman,* 156 W.Va. 592, 195 S.E.2d 739 (1973), the West Virginia quoted with approval from an early case dealing with the instant issue.

> "If a master knowingly employs or retains a careless and incompetent servant, he thereby impliedly authorizes or ratifies his negligent acts, committed in the course of his employment, *and, if the servant's negligence is wanton and willful or malicious, the master is liable for exemplary or punitive damages.*" (emphasis added)

*Id.* at 601, 195 S.E.2d at 745 (quoting syllabus point 4 of *Hains v. Parkersburg, Marietta & Innerurban Ry. Co.*, 75 W.Va. 613, 84 S.E. 923 (1915)). *See also Clairborne v. Chesapeake & Ohio Railroad Co.*, 46 W.Va. 363, 33 S.E. 262 (1899); *Ricketts v. Chesapeake & Ohio O.R. Co.*, 33 W.Va. 433, 10 S.E. 801 (1890); *Downey v. Chesapeake & Ohio Railroad Co.*, 28 W.Va. 732 (1886).

Although the cases speak of gross negligence, the same standard applies for fraudulent acts by an agent. If the Plaintiffs can prove knowledge on the part of Wheat of Merical's defalcations, or that it continued to employ him while suspicious of his actions, an award of punitive damages may be appropriate. Wheat's bare statement that the "Plaintiffs will be unable to prove that Wheat had any knowledge of Merical's acts or defalcation" is conclusory and of no significance at this point. The issue is one appropriate for resolution at trial.[4]

### D. *Breach of Fiduciary Duty*

Wheat argues that it is entitled to summary judgment on the Plaintiffs' claim for breach of fiduciary duty. It first points out that the issue is one which is determined by state law. *Greenwood v. Dittmer*, 776 F.2d 785 (8th Cir.1985). Wheat, contending that there is no West Virginia law on this point, looks to other jurisdictions for guidance. The Court, while agreeing that no West Virginia case is exactly on point, does not share Wheat's confidence that West Virginia law has *nothing* to offer on the subject.

The basis for Wheat's position that no fiduciary relationship existed between it or Merical and the Plaintiffs is found in the distinction it makes between a discretionary and nondiscretionary account. In a discretionary account the broker apparently has a free hand in buying and selling the securities of his client—his principal. He decides what is best for his client, with or without direct prior approval from the client. It is an ongoing agency relationship. On the other hand, "the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete." *Caravan Mobile Homes Sales v. Lehman Brothers, Kuen Loeb, Inc.*, 769 F.2d 561, 567 (9th Cir.1985). Wheat cites authority for the proposition that a fiduciary relationship does not arise where the account is nondiscretionary. *Greenwood, supra; McGinn v. Merrill-Lynch, Pierce, Fenner & Smith*, 736 F.2d 1254 (8th Cir.1984). The Plaintiffs' account was nondiscretionary, asserts Wheat, and, therefore, no fiduciary relationship developed.

The Court first has a problem with the "fact" that the Plaintiffs' account was nondiscretionary. Wheat does not tie this assertion to the record. The Court's own unguided search fails to unearth support for such a conclusion. Nevertheless, inasmuch as the Plaintiffs do not contest the issue, the Court will cautiously assume that the account was nondiscretionary.

The Court does not believe that the discretionary—nondiscretionary dichotomy is the shibboleth which Wheat attempts to make it out to be. While a few courts have based their holdings on the distinction, the Court does not find that the question will necessarily always be so neatly suitable for resolution. For instance, the same circuit which decided *Caravan Mobile Homes, supra*, the Ninth, has also held that California law, (which was applied in *Caravan Mobile Homes*) imposes fiduciary obligations "where the agent 'for all practical

---

4. The Court finds the Restatement to offer a helpful summary of when punitive damages may be appropriately assessed against a principal:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the principal or a managerial agent of the principal ratified or approved the act."

*Restatement (Second) of Torts,* § 909 (1977).

purposes' controls the account." *Leboce, S.A. v. Merrill-Lynch, Pierce, Fenner & Smith, Inc.*, 709 F.2d 605, 607 (9th Cir. 1983). The Ninth Circuit also noted in *Mihara v. Dean Witter & Co.*, 619 F.2d 814 (9th Cir.1980), in the context of churning, that "the requisite degree of control is met when the client routinely follows the recommendations of the broker" such that "a pattern of de facto control by the broker" develops. *Id.* at 821. Although the Eighth Circuit in *McGinn* applied the discretionary-nondiscretionary distinction in finding no fiduciary relationship to arise under Minnesota law, a subsequent district court decision implies that the law of that state may be flexible to a degree on the point. The court in *Corbey v. Grace*, 605 F.Supp. 247 (D.Minn.1985), remarked that a plaintiff seeking to establish a fiduciary relationship with a broker had to "specify the content of [a] special agreement *or relationship....*" *Id.* at 253. (Emphasis added).

In addition to the above authority, courts have found fiduciary relationships without undue emphasis being placed on the nature of an account. This is especially true in instances of churning. *See e.g., Mihara, supra; Miley v. Oppenheimer & Co.*, 637 F.2d 318 (5th Cir.1981).

Wheat is correct that West Virginia law is bereft of authority on the *specific* issue before the Court: Whether a distinction should be drawn between a discretionary and a nondiscretionary account. Nevertheless, it is well established under West Virginia law than an agent does owe a fiduciary duty to his principal. And, of course, a stock broker is an agent of his client. *Caravan Mobile Homes Sales, supra*, at 567. In *Moore v. Turner*, 137 W.Va. 299, 71 S.E.2d 342 (1952), the West Virginia court held that a "broker [employed to sell coal property] is a fiduciary required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment." *Id.* at 312, 71 S.E.2d at 349. (Quoting 8 Am.Jur., *Brokers*, § 86).

██ The point of this discussion is that there are several features to this case which could lead a jury to conclude that a fiduciary relationship existed between the Plaintiffs and Merical. Such a finding would implicate Wheat inasmuch as it could only act through its agents in establishing such relationships.

E. *State Securities Law Claims*

As one of their many claims the Plaintiff have invoked the civil liability provision of the Uniform Securities Act as adopted by West Virginia. *W.Va.Code*, § 32–4–410. That section provides in relevant part as follows:

"(a) Any person who

\*     \*     \*     \*     \*     \*

(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth of omission, is liable to the person buying the security from him, who may assert a claim in a civil action to recover the consideration paid for the security...."

The Plaintiffs also allege that Merical violated § 13.05 of the West Virginia Securities Rules and Regulations which were promulgated by the West Virginia Securities Commissioner. Wheat has moved for summary judgment as to both aspects of the Plaintiffs' state securities claim.

██ Turning first to the violation of the regulation, the Court finds Wheat's motion to be well taken. As Wheat points out, § 13.05 was drafted in connection with *W.Va.Code*, § 32–2–204(a)(2)(G), a provision to which no civil liabilities attach. The Legislature expressly negated any inference that civil liability could attach under that section by declaring in paragraph (h) of § 32–4–410 that Chapter 32 "does not create any cause of action not specified in

this section or section 202(e)." Apparently the Plaintiffs concede this point as they do not rebut the arguments of Wheat. Accordingly, the Court will enter summary judgment in favor of Wheat on the alleged violation of the regulation.

The Court also agrees with Wheat as to the requirements of *W.Va.Code*, § 32–4–410(a)(2). By its express language, the statute requires that any misrepresentation be in connection with the sale of a security. It is also obvious that any misrepresentation (or omission) must pertain to the purchase of a security for which damages are claimed. In other words, the Plaintiffs may not identify a misrepresentation made in connection with the sale of one security, and consequently, claim damages for an unrelated transaction.

In response to Wheat's arguments that the Plaintiffs can identify no misrepresentations made by Merical, the Plaintiffs cite portions of Mr. Baker's deposition in which he refers to allegedly false information given by Merical on a security known as Petro-Lewis. Wheat, however, retorts that the Plaintiffs made at least a $28,000 profit on the Petro-Lewis transaction. It asserts that a plaintiff cannot recover for damages which have not been incurred, damages being an essential element of a securities fraud claim. As to this last proposition, the Court has no quarrel. But the Court does not believe it has the information before it to conclude that the Plaintiffs did make a profit on the Petro-Lewis transaction. Wheat has not supported the assertion of fact made in its memorandum with proper documentation pursuant to *Rule* 56 of the Federal Rules of Civil Procedure. Moreover, the Court believes genuine issues of material fact to be extant as to whether misrepresentations were made in connection with the sale of securities.

■ Wheat raises the issue of whether the controlling person provision found in *W.Va.Code*, § 32–4–410 provides the exclusive theory by which an employer, such as Wheat, may be found liable for the defalcations of an employee, such as Merical.[5] The same issue was raised in regard to the controlling person provisions found in the federal security laws. That issue was resolved in favor of the line of authority holding that principles of *respondeat superior* are not displaced by a controlling person provision. As to whether this result is appropriate under West Virginia's statute is apparently an issue of first impression. The Court is guided, however, by the "statutory policy" which commands that "chapter [32] shall be so construed as to coordinate the interpretation and administration of this chapter with the related federal regulation." *W.Va.Code*, § 32–4–415. In light of this express legislative policy, the Court discerns no reason to reach a result contrary to that announced with regard to the controlling person provision found in the 1934 federal act.

### F. *Incompetent Financial Advice*

Wheat has moved for summary judgment on the Plaintiffs' claim for rendering of incompetent financial advice. It points out that the Plaintiffs have cited "no authority that a cause of action for incompetent financial advice even exists." Wheat's reply memorandum at 26. On the other hand, Wheat has offered no authority to the contrary. Moreover, it boldly states in its memorandum that Wheat gave no advice to the Plaintiffs. No affidavits or other supporting documentation, however, is offered in support of this assertion.

■ The Court tends to agree with Wheat that this theory is perhaps a compo-

---

5. The controlling person provision of the state act provides in pertinent part as follows:

"(b) Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer or director of such a seller, occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."
*W.Va.Code*, § 32–4–410(b).

nent of a fiduciary duty or common law fraud claim. Nevertheless, the Court does not reject the possibility that the Plaintiffs may be able to establish that Wheat through its agent Merical had, if not a duty to provide financial advice, then a duty to use due care in providing *competent* financial advice when it chose to make such provision. A breach of a duty of care is the essence of any tortious theory.

Wheat having failed to carry its burden in showing why the Plaintiff should not be allowed to go forward with this theory, the Court will deny its motion.

### G. *Common Law Fraud*

Finally, Wheat has moved for summary judgment on the Plaintiffs' claim of common law fraud. Because the allegedly fraudulent acts of Merical form the basis of the claim, Wheat has divided his acts into three categories: (1) theft of $1,000 in cash intended for purchase of stock in American Pace Fund; (2) embezzlement of $15,250 through the use of a letter of authorization; and (3) misrepresentations regarding the holdings and value of such holdings in their account.

As to the first two categories, Wheat asserts that as criminal wrongs the acts fall outside the course and scope of Merical's employment with Wheat. The Court does not agree with Wheat's view of the law. The Restatement speaks directly and succinctly to this point: "An act may be within the scope of employment although consciously criminal or tortious." *Restatement (Second) of Agency*, § 231. Certainly, Merical's acts may be viewed as either of a criminal or intentionally tortious nature. It has long been the law of West Virginia that a principal may be liable under a theory of *respondeat superior* for the torts of its agents. *Nees v. Goldman Stores*, 106 W.Va. 502, 146 S.E. 61 (1928). In *Musgrave v. Hickory Inn, Inc.*, 168 W.Va. 65, 281 S.E.2d 499 (1981), the Court implicitly recognized that a principal could be liable for a battery committed by an agent.

Wheat attempts to distinguish the above cases as inapplicable "since they are not reasonably related to the facts in the case at bar and since they do not involve self-serving, *intentional acts of fraud* on the part of an employee, not designed or intended to further the interest of his employer." Plaintiffs' reply memorandum at 28. The Court is unpersuaded that the facts of the two cases create a distinction when compared to this one. Battery and fraud are both intentional torts. If anything, battery is the more egregious of the two. On the other hand, the issue which Wheat raises by characterizing Merical's acts as "self-serving" may be of note. The Court turns again to the helpful language of the *Restatement*: "An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed." *Restatement (Second) of Agency*, § 235. The comment follows this statement with the observation that it is the agent's state of mind which is material. Comment a. The Court need not tarry long in noting that issues involving states of mind are especially unsuitable for resolution at the summary judgment stage.

■ Returning to the more basic inquiry of whether Merical was acting within the scope or course of his employment, the Court notes that this too is an issue of fact suited for resolution at trial. The rule to be followed was best expressed in the text of an early West Virginia case.

"If the master, when sued for an injury resulting from the tortious act of his servant while apparently engaged in executing his orders, claims exemption upon the ground that the servant was, in fact, pursuing his own purposes, without reference to his master's business, and was acting maliciously and willfully, it must, ordinarily, be left to the jury to determine this issue upon a consideration of all the facts and circumstances proved."

*Nees v. Goldman Stores*, 106 W.Va. 502, 505, 146 S.E. 61 (1928) (quoting *Rounds v. D.L. & W.R.R. Co.*, 21 Am.Rep. 597).

The Court similarly finds unpersuasive Wheat's argument as to the third category of acts by Merical. Wheat contends that the "Plaintiffs have failed to establish that they relied upon a specific misrepresentation which resulted in identifiable damages." Wheat's memorandum at 34. Wheat, however, does not support its argument with references to interrogatories, answers, depositions, affidavits or the like. References to the pleadings will not do. The pleadings, having been liberally construed, must be pierced. As opposed to the Plaintiffs having failed to establish their claim, Wheat with the initial burden on it at this stage, has failed to establish the invalidity of their claims.

### III. Discussion of Plaintiffs' Motion for Summary Judgment

To a certain extent the Plaintiffs' motion covers the same areas as does Wheat's motion. To avoid duplication, the Court will refer, when necessary, to the earlier discussion.

#### A. Federal Securities Law Claims

1. Claim that Defendant Merical Forged Signatures on Documents that Transferred Securities.

The Plaintiffs fail to identify which documents were forged by Merical. Nowhere in their argument is there a citation to the record. Merical does not admit in his affidavit that he forged the Plaintiffs' signatures to documents which transferred securities. He only admits that he forged a letter of authorization so as to transfer $15,250 from the Plaintiffs' account. That transaction, however, does not appear to be related to the sale or purchase of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975) (only actual purchasers or sellers of securities may bring a private damages action under *Rule* 10b–5). The Court, therefore, concludes that the Plaintiffs are not entitled to summary judgment.

2. Claim that Merical Embezzled Funds.

The transfer of $15,250 from the Plaintiffs' account to another account was clearly criminal, as Wheat admits. It was not, however, connected with the sale or purchase of securities. The Plaintiffs, therefore, do not have standing under *Rule* 10b–5; they must be the actual purchasers or sellers of the security. Although a wrongful act, the transfer of funds just does not fall under the perview of *Rule* 10b–5. Even that rule must have its limits.

■ The payment of $1,000 to Merical by the Plaintiffs may have been intended for the purchase of securities, but no purchase was ever made or even negotiated. A wrongful act in a deal which stops short of purchase or sale is not actionable under *Rule* 10b–5. *Northland Capital Corp. v. Silver*, 735 F.2d 1421 (D.C.Cir.1984).

The cases cited by the Plaintiffs are inapposite. It is one thing to characterize an act as fraudulent in enforcement actions brought by regulatory entities; it is another to conclude that said fraudulent act is actionable under *Rule* 10b–5. *See SEC v. Materia*, 745 F.2d 197 (2d Cir.1984) (noting distinction between private civil litigation and enforcement action).

3. Claim of Unauthorized Trading in Plaintiffs' Account.

■ The Plaintiffs move for summary judgment on their allegation that Merical conducted unauthorized trades in their account. In reviewing this portion of the motion, the Court is of course bound by the Supreme Court precedent that scienter—that is intent to deceive—is a necessary element of a *Rule* 10b–5 action. *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Court also notes that unauthorized trading in an account will not alone make out a case under *Rule* 10b–5. *Brophy v. Redivo*, 725 F.2d 1218 (9th Cir.1984). There must be an intent to deceive or defraud. *Id.* The Plaintiffs would have the Court infer such an intent from the record. The Court at this point refuses to do so.

As the Defendant points out, additional questions arise as to which of the trades were unauthorized (that information is not before the Court), whether any trades were

retroactively authorized, and what damages, if any, were suffered by the Plaintiffs.

### B. *State Securities Law Claimes*

This claim was discussed in connection with the motion made by Wheat. The Plaintiffs have alleged a violation, *inter alia,* of *W.Va.Code,* § 32–1–101. The Plaintiffs, however, cannot recover under that section. That section does not authorize a civil action for the enumerated violations. A civil action under the state act may only be initiated under § 32–4–410. That section includes a provision which negates any implied rights of action arising under other sections of the chapter. The Plaintiffs are, therefore, limited to showing a misrepresentation related to the offer or sale of the security. The Court believes there are genuine issues of material fact on this point.

### C. *Breach of Fiduciary Duty*

The Plaintiffs have moved for summary judgment on the issue of whether Merical and Wheat breached a fiduciary duty owed to the Plaintiffs. The Court concluded in regard to the Defendant's motion on this claim that an inquiry into the facts of the case would be helpful and, therefore, summary disposition would be inappropriate. The inquiry will be addressed to the circumstances and particulars of the relationship between Mr. Baker and Merical.

### D. *Common Law Fraud*

1. Theft of $1,000.

In *Lengyel v. Lint,* 280 S.E.2d 66 (W.Va.1981), the West Virginia court set forth the essential elements of a common law fraud claim:

> "(1) That the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it."

*Id.* at 69. The Court in applying the undisputed facts to the above elements concludes that summary judgment should be entered in favor of the Plaintiffs and against Merical on this claim.

A clearer case of fraud cannot be made out. Merical represented to the Plaintiffs that he would use the $1,000 to purchase shares in American Pace Fund. The representation was material and it was false. Merical appropriated the money to his own use. The Plaintiffs relied on the representation to their detriment; they delivered the money to Merical. The money not having been returned, the damage is apparent.

2. Theft of $15,250.

Although the act relating to this sum was clearly criminal, the Court cannot in this civil action state as a matter of law that such was "fraud." The Plaintiffs point to no representation or act by Merical upon which they relied. Indeed it appears that there were no communications between Merical and the Plaintiffs on this transaction. Without meaning to rule on issues not before the Court, it is noted that the act appears to be more in the nature of a conversion. In any event, summary judgment for the Plaintiffs is not appropriate on this claim.

### E. *Vicarious Liability of Wheat*

The Plaintiffs are not entitled to summary judgment on the question of Wheat's vicarious liability. As previously discussed, the crucial inquiry is whether Merical was acting within the course of his employment. If he was, then Wheat may be vicariously liable. The question, however, is one of fact for the jury, or, upon a clear failure of proof, for the Court on a motion for directed verdict.

### IV. *Conclusion*

In accordance with the foregoing discussion, the Court ORDERS as follows:

1. That Wheat's motion for summary judgment on the statute of limitations is denied inasmuch as the applicable limitations period is three years for an action under *Rule* 10b–5. Moreover, a genuine

issue of material fact exists as to when the Plaintiffs factually became cognizant of their common law claims;

2. That Wheat's motion for summary judgment on the issue of *respondeat superior* is denied inasmuch as the controlling person provision and the 1934 Act does not preempt common law agency principles;

3. That Wheat's motion for summary judgment on the issue of punitive damages is granted insofar as it sought a ruling that punitive damages are not available under the federal securities law; it is denied inasmuch as punitive damages may be awarded against a principal on common law theories;

4. That Wheat's motion for summary judgment on the issue of breach of fiduciary duty is denied;

5. That Wheat's motion for summary judgment on the issue of whether a violation of state securities law occurred is denied; it is granted, however, as it pertains to § 13.05 of the West Virginia Securities Rules and Regulations;

6. That Wheat's motion for summary judgment on the issue of whether incompetent financial advice was provided to the Plaintiffs is denied;

7. That Wheat's motion for summary judgment on the Plaintiffs' claim of common law fraud is denied;

8. That the Plaintiffs' motion for summary judgment on their federal securities law claims is denied;

9. That the Plaintiffs' motion for summary judgment on their state security law claims is denied;

10. That the Plaintiffs' motion for summary judgment on the issue of fiduciary duty is denied;

11. That the Plaintiffs' motion for summary judgment on their claim for common law fraud is granted with respect to the $1,000 given to Merical for purchase of American Pace Fund stock, and summary judgment is entered in favor of the Plaintiffs and against the Defendant Merical on that claim; in all other respects the motion is denied;

12. That the Plaintiffs' motion for summary judgment on the issue of whether Wheat is vicariously liable to them for the actions of Merical is denied;

13. That the Plaintiffs' request for *Rule* 11 sanctions against Wheat is denied.

The Clerk is directed to send a certified copy of this Memorandum Opinion and Order to counsel of record.